**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3470

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROL WHITE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> LPL FINANCIAL HOLDINGS INC. and LPL FINANCIAL LLC, <br><br> Defendants. | Case No. **'24 CV 1724 RSH KSC** <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

## I.    **<u>INTRODUCTION</u>**

1.    This class action arises out of LPL's drastic under-payment of interest to its own customers in its cash sweep program.  LPL underpaid its customers in violation of its fiduciary and contractual duties in order to enrich itself at its customers' expense.  Rather than pay its customers a "reasonable" rate of interest on their cash as it was required to do, LPL instead paid miniscule rates to its customers, while it earned hundreds of millions of dollars on that cash due to rising interest rates.

2.    In a typical cash sweep program for a brokerage customer, the brokerage firm moves uninvested cash from a customer's brokerage account into an interest-bearing account that generates returns for the client.  When LPL sweeps its customers' cash into its cash sweep program, LPL uses that cash to generate outsized returns for itself, due to the spread between the interest income that LPL earns on the cash in high interest rate environments, and the amount of interest that it pays its clients.

3.    LPL is required to act as a fiduciary in the best interests of its clients.  That includes a duty to put its customers' interests ahead of its own when recommending and making investments for them.  In addition, under the law, the agreement between LPL and its clients carries with it an implied covenant of good faith and fair dealing.  That includes an implied promise that neither party will do anything to frustrate the fruits of the customers' bargain with LPL.

4.    Rather than act as a fiduciary in the best interests of LPL's account holders, or fulfill its contractual and implied covenant obligations to its customers, LPL used its customers' funds to enrich itself at the expense of its own clients.

5.    Rising interest rates presented an opportunity for LPL customers to earn more on their cash sweep account balances.  By improperly keeping the interest rates paid on cash sweep accounts low, LPL usurped that opportunity for itself, leveraging

its own clients' cash for its own benefit and earning near-guaranteed outsize returns year after year.

6. For example, the yield on short-term U.S. Treasury bills increased dramatically over the past two years, and it has been above 5.25% for most of the past year. By contrast, since August 2, 2023, LPL paid customers with cash sweep accounts (and assets at LPL under $150,000) an interest rate of only 0.35%. That is **more than 13 times less** than the prevailing short-term Treasury Bill yield.

7. There is nothing "reasonable" or "fair" about those rates, or about LPL using its clients' cash balances to reap windfall profits at these disproportionate spreads. In stark contrast, Fidelity—an LPL competitor—automatically sweeps uninvested cash in its clients' brokerage accounts into a money market fund currently earning approximately 5%. LPL's misconduct was a breach of its fiduciary duties, a breach of its contracts, and a breach of the implied covenant of good faith and fair dealing.

8. Plaintiff, individually and on behalf of the proposed Class defined *herein*, brings this class action to remedy the significant financial harm caused by LPL's use of its cash sweep program to enrich LPL at the cost of its own clients.

## II. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over Plaintiff's and the Class's claims pursuant to the Class Action Fairness Act, including section 28 U.S.C. § 1332(d). The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and Plaintiff and other class members are a citizen of States different from the Defendant.

10. This Court has personal jurisdiction over Defendants because they conduct substantial business in this District and have their principal places of business here.

11. Venue is proper in this District under 28 U.S.C. § 1391(b).

## III.    PARTIES

### A.    Plaintiff

12.    Plaintiff Carol White ("Plaintiff") is a citizen of Colorado, who maintained an account that was managed by Defendant LPL Financial LLC, which is a registered investment advisor.  The cash balances in her advisory account were, at times, swept into LPL's Deposit Cash Account program.

### B.    Defendants

13.    Defendant LPL Financial Holdings Inc. is a Delaware holding corporation with its principal place of business in San Diego, California.  Together with its subsidiaries, LPL Financial Holdings, Inc. provides brokerage and investment advisory services.

14.    Defendant LPL Financial LLC is LPL Financial Holdings Inc.'s primary broker-dealer subsidiary and an investment advisor.  It transacts business in a broad array of financial products and services.  It is incorporated in Delaware and has its principal place of business in San Francisco, California.

15.    LPL Financial Holdings Inc. and LPL Financial LLC are referred to collectively herein as "LPL" or "Defendants."

## IV.    FACTUAL ALLEGATIONS

### A.    LPL's Cash Sweep Programs

16.    Net interest income is the difference between how much interest banks earn on loans and investments, and how much they pay out to depositors.  LPL is motivated to increase its net interest income by depressing the value of the interest that it pays to its customers, while taking advantage of the interest LPL itself earns on higher rates paid on the customer cash that is held at LPL.

17.    LPL has two different cash sweep programs under LPL's automatic cash sweep program: (i) the Insured Cash Account program ("ICA"); and (ii) the Deposit Cash Account program ("DCA").  The ICA program is LPL's cash sweep program for non-IRA customer accounts.  The DCA program is LPL's cash sweep

program for IRA customer accounts.  Collectively, these are referred to herein as the "Cash Sweep Program."

18.   The LPL Cash Sweep Program sweeps customer cash to interest-bearing deposit accounts at banks that are both affiliated and unaffiliated with LPL. In addition, if a client's cash exceeds the $250,000 FDIC limit at each of the client's assigned banks, the excess amount will be deposited in the "Excess Banks." Regardless of whether the banks are affiliated or unaffiliated with LPL, the interest rates paid to LPL customers are determined by the fees that LPL charges the banks.

19.   LPL has control and discretion over the specific banks to which it sweeps customers' cash.  The ICA Disclosure Booklet and DCA Disclosure Booklet (collectively, the "Disclosure Booklets") provide that the assigned Cash Sweep Program is based on the type of account the client holds.   The ICA Disclosure Booklet provides that, "***Under the ICA program, [LPL], acting as your agent, will automatically transfer (or "sweep") available cash balances in your eligible accounts***—including proceeds of securities transactions, dividend and interest payments, cash deposits, and other monies—into interest-bearing deposit accounts ("Deposit Accounts") insured by the Federal Deposit Insurance Corporation ("FDIC").   The Deposit Accounts will be held at one or more banks or other depository institutions ("Banks") identified on one of two Priority Bank Lists ("PBLs") maintained by LPL, designated PBL1 and PBL2, respectively.  Available cash balances in your eligible accounts will be swept to Banks appearing either on PBL1 or PBL2, to be determined based on the date on which you open your newest eligible account."

20.   Likewise, the DCA Disclosure Booklet provides that, "***Under the DCA program, available cash balances (from securities transactions, dividend and interest payments, cash deposits, and other activities) in your eligible accounts will automatically be deposited (which we refer to as sweeping) into interest-bearing Federal Deposit Insurance Corporation (FDIC) insured deposit accounts (Deposit***

*Accounts)* at one or more of the banks or other depository institutions set forth on the DCA program Available Bank List (ABL) (referred to through the rest of this document simply as Banks/Bank)." The DCA Disclosure Booklet further provides that, "***As your agent, LPL will sweep your cash out of your LPL account and into the participating Banks***, subject to certain capacity limits, but not intending to exceed the maximum levels of insurance as defined by the FDIC per category."

21.    LPL controls and has discretion over: (a) the characteristics and parameters of each of the available Cash Sweep Program options (IDA and DCA); (b) the banks in which customers' swept cash is deposited, including for any cash that exceeds FDIC limits; and (c) the rates of interest actually paid to customers on their Cash Sweep Program deposits (including because LPL sets the annual fee charged to the banks, which reduces the interest rate the banks are willing to pay to customers).

22.    Due to LPL's control and discretion over investors' cash sweep holdings and the returns on such holdings, LPL owes a fiduciary duty to all of its customers with cash in sweep accounts, which includes a duty to act in their best interests, and to place such best interests ahead of LPL's own self-interest. LPL breached that fiduciary duty when it swept client cash into its Cash Sweep Program vehicles that paid customers unreasonably low interest rates.

**B.    LPL's Duties to Its Clients**

23.    LPL Financial LLC is a registered investment advisor bound by the fiduciary duties imposed on it by the Investment Advisors Act of 1940, including duties of care and loyalty. This includes a duty for LPL Financial LLC to act in the best interests of its clients, and to place the best interests of its customers ahead of its own self-interest. Similar duties are imposed on LPL under principles of broker-dealer law.

24.    LPL Financial LLC has an investment advisor relationship with the members of the Class.  LPL Financial LLC has discretion over the amount of interest secured or paid to its customers.

25.    LPL also has a duty to secure a reasonable rate of interest for clients' uninvested cash.

26.    Internal Revenue Code Section 4975, the provisions of which apply to LPL's IRA accounts, taxes "prohibited transactions," including when an IRA plan sponsor engages in transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account."  26 U.S.C. § 4975.

27.    A "disqualified person" includes those "providing services to the plan." 26 U.S.C. § 4975(e)(2)(B).  This would include a bank that holds client assets and an advisory firm that determines which bank will hold those assets, including LPL.

28.    One safe harbor to the taxation of prohibited transactions is "the investment of all or part of a plan's assets in deposits which bear a ***reasonable interest rate*** in a bank or similar financial institution."  26 U.S.C. § 4975(d)(4). These provisions explicitly target situations where a firm might attempt to benefit from holding its client funds by paying them unreasonably low interest rates, and they are instead required to pay a "reasonable interest rate."  Accordingly, under 26 U.S.C. § 4975, Defendants were required to pay a reasonable interest rate to LPL clients.

29.    In the context of accounts governed by 26 U.S.C. § 4975(c), the U.S. Department of Labor defined a "reasonable rate" by considering fair market rates and similar benchmarks, including "short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills)."

30.    The U.S. Treasury regulations include a similar requirement where LPL "invests plan assets in deposits in itself or its affiliates." 26 C.F.R. § 54.5975-6(b)(3)(i). In those circumstances, the parties' agreement "must name" the bank and "state that [the bank] may make investments in deposits which bear *a reasonable rate of interest* in itself (or in an affiliate)." *Id*.

31.    In sum, federal law requires that LPL pay its clients a "reasonable" interest rate.

### C.    LPL Is Contractually Obligated to Act in its Clients' Best Interest

32.    Pursuant to LPL's Master Account Agreement and Retirement Plan Brokerage Account Agreement, LPL customers and LPL agree that LPL will act as an agent on behalf of its clients. Specifically, the agreement defines "LPL" as LPL Financial LLC, and it states that, "As your agent, LPL will sweep cash out of your LPL Account and into the participating banks."

33.    LPL further states in its Master Account Agreement that, "When we provide you with a recommendation as your broker-dealer or act as your investment adviser, *we have to act in your best interest and not put our interest ahead of yours*."

### D.    LPL's Cash Sweep Contracts Include an Implied Covenant of Good Faith and Fair Dealing

34.    Under Massachusetts law—which governs LPL customers' agreements regarding their cash sweep accounts—all contracts contain an implied covenant of good faith and fair dealing, which encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included.

35.    This implied covenant includes a pledge that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

36.    The Disclosure Booklets include the following terms: "The interest rates paid by a Bank may be higher or lower than the interest rates available to depositors making deposits directly with the Bank or other depository institutions in comparable accounts and for investments in money market mutual funds and other cash equivalent investments available through LPL."  This term indicates that it is possible the interest rate paid on LPL cash sweep accounts may be higher than interest rates paid on comparable accounts and investments, including money market mutual funds and other cash equivalent investment options that are available through LPL.  This term further implies that even if the interest rate paid on LPL cash sweep accounts is lower than the rates paid in comparable accounts, that interest rate still must be reasonable.

37.    The Disclosure Booklets also include the following term: "The interest rates paid are determined by **the amount the Banks are willing to pay** minus the fees paid to LPL and other parties."  This term indicates that the LPL customer should expect the interest rates paid by the Banks to be an amount determined by a reasonable arm's-length negotiation between LPL and the Banks based on the prevailing interest rate environment.  It further implies that LPL will reduce that amount by a reasonable "fee" and not significantly depress the amount of interest rates ultimately paid to customers by extracting reasonably high payments for itself and "other parties."

**E.    LPL Breached Its Fiduciary Duties, Contractual Obligations, and the Implied Covenant of Good Faith and Fair Dealing, and Thereby Profited At Its Clients' Expense**

38.    LPL breached and continues to breach its duties to secure reasonable interest rates for its clients' deposits, its contractual obligations, and the implied covenant of good faith and fair dealing, because the interest paid on its clients' cash deposits was and is not reasonable, and the so-called "fee" it extracted for itself was not reasonable.

39.    Below is a chart of exemplary interest rates paid in the ICA program, which depended on the "aggregate value of all linked eligible accounts," or "Household Value," at LPL:

| Approximate Dates | Amount of Customer Assets Held at LPL | Interest Rate |
|---|---|---|
| August 2022 through August 2023 | $0 - <$150,000 | 0.10% |
| | $150,000 - <$300,000 | 0.12% |
| | $300,000 - <$500,000 | 0.12% |
| | $500,000 - <$750,000 | 0.12% |
| | $750,000 - <$1,500,000 | 0.20% |
| | $1,500,000 - <$5,000,000 | 0.20% |
| | $5,000,000 - <$10,000,000 | 0.25% |
| | $10,000,000 and up | 0.30% |
| August 2023 through present | $0 - <$150,000 | 0.35% |
| | $150,000 - <$300,000 | 0.40% |
| | $300,000 - <$500,000 | 0.45% |
| | $500,000 - <$750,000 | 0.50% |
| | $750,000 - <$1,500,000 | 0.80% |
| | $1,500,000 - <$5,000,000 | 1.15% |
| | $5,000,000 - <$10,000,000 | 1.25% |
| | $10,000,000 and up | 2.20% |

40.    The interest rate paid in the DCA program as of September 2024 is 0.35%, regardless of account balance.  The interest rate paid in the DCA program as of August 1, 2022, was 0.16%, regardless of account balance.

41.    As set forth above, from as far back as August 2022, for customers in the ICA program with up to $150,000 in assets at LPL, LPL paid as little as .10% in interest, and only up to .35%.

42.    The U.S. Department of Labor has provided the following definition of a "reasonable" rate of interest:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those

> applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646, 34648 (2003).

43.     The Internal Revenue Service similarly defines an "arm's-length interest rate" as:

> a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 C.F.R. § 1.482-2(a)(2).

44.     Under these terms, and any prudent understanding of what a "reasonable" rate of interest is, LPL did not secure or pay a reasonable rate of interest to its customers, including Plaintiff and Class members. This is supported by reference to other leading indicators of interest rates being paid during this time period.

**1.     The Federal Funds Rate Benchmark**

45.     The Federal Funds Rate benchmark demonstrates that the interest rate paid to LPL cash sweep accountholders was not reasonable. The federal funds market consists of domestic unsecured borrowings by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises. In other words, it is the market of unsecured borrowing transactions, principally between banks. The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions.

46.     The Federal Funds Rate increased dramatically in recent years, with an effective rate of 5.33% as of August 28, 2024, for example.  The chart below shows the stark and prolonged increase in the Federal Funds Rate over the past several years.  By contrast, the interest rate paid to LPL cash sweep account holders has been drastically lower:



### 2.     The Interest Rates on Sovereign Short-Term Debt Benchmark

47.     The yield on short-term U.S. Treasury Bills also demonstrates that the interest rate paid on LPL cash sweep accounts was not reasonable.  U.S. Treasury Bills are short-term securities issued by the U.S. Department of the Treasury with maturities ranging from four to 52 weeks.  They are sold at a discount to their face value, and when they mature, the investor is paid the face value.  Treasury Bills are considered safe investments, but they generally do not produce high returns over time, especially in a low-interest-rate environment.

48.    The yield on a U.S. Treasury Bill is the interest rate that the U.S. government pays to borrow money for a set period of time, expressed as a percentage.  As shown in the graph below, over the past several years, the yield on the shortest term (one month) U.S. Treasury Bill has steadily increased from close to zero in 2021 to approximately 5.5% in mid-2023, and has remained at that level through August 2024:



**Yield Curve**

During this timeframe, the interest rate LPL paid to cash sweep account holders remained a tiny fraction of that benchmark.

### 3.    Other Institutions' Sweep Account Interest Rates

49.    Other firms that swept cash to unaffiliated banks paid interest rates that more closely resemble arm's-length negotiations, and therefore more closely reflect the prevailing business and market conditions, than the rates paid by LPL.

50.    For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and they have consistently paid significantly higher rates of interest than LPL.  At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of asset tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million). LPL, in contrast, paid 0.20% interest (on cash balances between $750,000 and $5

million), 0.25% interest (on cash balances between $5 million and $10 million), and 0.30% interest (on cash balances above $10 million) at year-end 2022.

51.     Additional examples include Robinhood's rate of 4.9% for Robinhood Gold members as of July 27, 2023, and WeBull's rate of 5%.

52.     Similarly, Fidelity and R.W. Baird have significantly increased the rates they paid on swept cash.  As of January 12, 2024, Fidelity paid 2.69% interest on cash balances regardless of asset tier, and R.W. Baird paid between 2.03% interest (on cash balances up to $1 million) and 4.11% interest (on cash balances above $5 million).  In comparison, as of January 2024, LPL paid only 0.80% (on cash balances between $750,000 and $1.5 million), 1.25% (on cash balances between $5 million and $10 million), and 2.20% (on cash balances above $10 million).

53.     In addition, the interest rate offered by Vanguard on its sweep program is 4.15% regardless of asset tier.

54.     As these data show, other brokerage and advisory financial institutions that have cash sweep programs pay or secure significantly higher interest rates than LPL.

### 4.    Money Market Rates

55.     Money market rates are another benchmark for determining a "reasonable rate."  Crane's Retail Money Fund Index, for example, cited market rates of 4.85% as of August 31, 2024.

### 5.    The Interest Rate Applicable to Short-term Instruments Such as Repurchase Agreements

56.     The prevailing interest rates applicable to short-term instruments such as repurchase agreements were also significantly higher than LPL's cash sweep account interest rates.

57.     A repurchase agreement (also known as a "repo") is a short-term lending instrument that involves the sale and repurchase of securities.  In a repo, a borrower sells a security to a lender, usually a bank or securities dealer, and agrees

to buy it back at a specified date and price. The price is typically higher than the original sale price, reflecting the interest charge for borrowing over the period. The security serves as collateral for the lender. A repo can be based on any security, but they usually involve government debt or other debt instruments with steady values.

58.    The overnight repo rate is the interest rate at which different market participants swap treasuries for cash to cover short-term cash needs. From April of 2023 through April of 2024, for example, the overnight repo rate in the United States ranged from approximately 4.83% in April 2023 to as high as 5.55% in December 2023. These rates are significantly higher than the cash sweep interest rates offered by LPL.

**F.    LPL Was Unjustly Enriched by Its Misconduct**

59.    LPL derives significant financial benefits at the direct cost of its clients by keeping the interest rates for its cash sweep accounts artificially low, while it earns higher interest rates on those deposits.

60.    LPL benefits financially from cash balances held in the ICA and DCA programs through the "spread" that its affiliated banks earn on deposits and the annual fees LPL receives from affiliated and unaffiliated banks.

61.    An example of the partial benefit to LPL received from the setting of cash sweep interest rates on cash sweep accounts is reflected by the massive growth of its net interest income from 2022 to present. Between 2022 and 2023, LPL's net interest income increased ***107%*** from $77 million to $160 million.

**V.    CLASS ACTION ALLEGATIONS**

62.    Plaintiff re-alleges and incorporates by reference the allegations set forth above. Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this class action individually, and seeks certification of the Class of all retail clients of LPL who had cash deposits in LPL's Cash Sweep Program.

63.    Excluded from the Class are Defendants, including LPL and any of its affiliates, and their officers and directors.

64.     The Class members are so numerous that their individual joinder is impracticable.  LPL has thousands of customers nationwide.  The Class thus satisfies the numerosity requirement of Federal Rule 23.

65.     Once certified, Class members may be notified of the pendency of this action by customary means pursuant to the requirements of due process, including via mail, media publication, electronic communication, or other appropriate means and methods.

66.     Common questions of law and fact also exist and predominate with respect to the claims of all members of the Class.  These common questions of law and fact include the following:

a)     The terms and scope of LPL's duty to members of the Class, and the extent to which LPL breached that duty;

b)     Whether the interest rates paid by LPL on its Cash Sweep Account programs are reasonable;

c)     Whether LPL breached the contractual terms of its investment programs with members of the Class;

d)     Whether LPL breached the implied covenant of good faith and fair dealing with members of the Class;

e)     Whether LPL was unjustly enriched by its wrongful conduct;

f)     Whether LPL committed gross negligence;

g)     The extent to which Class members are entitled to damages or other monetary relief; and

h)     Whether and to what extent Plaintiff and Class members are entitled to the award of attorneys' fees and the reimbursement of litigation expenses.

67.     Plaintiff's claims are typical of the claims of the other members of the Class and because they were all LPL retail account holders to whom LPL paid an unreasonably low interest rate on their cash sweep account holdings.  Plaintiff's

claims are typical of the claims of the other members of the Class because they arise from the same cash sweep program and misconduct by the Defendants. In addition, the relief sought by members of the Class is common to such members.

68. Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has retained skilled counsel who are experienced in the prosecution of complex class action litigation.

69. Plaintiff has no interests that are adverse to the interests of the members of the Class.

70. A class action is a superior vehicle for the present dispute compared to all other available means to redress the claims of Plaintiff and the other members of the Class. The financial harm that each individual Class member has suffered is small relative to the cost and burden required for each Class member to individually litigate his or her claims against the Defendants. Absent certification of this case as a class action, it would be virtually impossible for individual Class members to obtain effective redress for the wrongs alleged herein.

71. Superiority is further satisfied here, where the law of Massachusetts will apply to all state law claims under the terms of LPL's contracts with its customers.

## VI.    PLAINTIFF'S CLAIMS FOR RELIEF

### COUNT ONE

**Breach of Fiduciary Duty**
**Brought on behalf of the Class Against All Defendants**

72. Plaintiff, individually and on behalf of the Class, hereby re-alleges the allegations set forth above as if fully set forth herein.

73. Defendants owed fiduciary duties to the Class due to Defendants' exercise of control and discretion over Plaintiff's and other Class members' financial holdings.

74.     Defendants' duties to Plaintiff and the members of the Class included (i) a duty of care; (ii) a duty of loyalty to their clients; and (iii) a duty to act in the best interest of their clients, including by placing the interests of their clients ahead of their own best interests.

75.     As set forth above, Defendants breached their duties to the clients when they (i) allocated clients' cash into sweep accounts that benefited LPL's interests above their clients' interests; and (ii) set and paid an unreasonably low rate of interest on clients' cash sweep accounts through LPL's collection of unreasonable fees.

76.     Defendants' past and ongoing breaches of their fiduciary duties to Plaintiff and the Class members damaged Plaintiff and the Class because they failed to earn a reasonable rate of return on their cash balances while the benefit that accrued to LPL damaged Plaintiff and the Class.

77.     Accordingly, Plaintiff, individually and on behalf of the Class, seeks all damages permitted by law.

**COUNT TWO**

**Unjust Enrichment**
**Brought on behalf of the Class Against All Defendants**

78.     Plaintiff, individually and on behalf of the Class, hereby re-alleges the allegations set forth above as if fully set forth herein.

79.     Defendants' wrongful conduct caused Plaintiff and the other members of the Class to receive unreasonably low interest payments on their cash sweep deposits and Defendants derived the benefit of such under-payment in the form of net interest income, fees and other financial benefits.

80.     As a result, Defendants were unjustly enriched by their misconduct, and Plaintiff and the other members of the Class conferred a benefit upon Defendants because they received significantly greater net interest income than they otherwise would have, but for Defendants' misconduct.

81.    Defendants understood, accepted, and retained the benefits conferred by Plaintiff and the other members of the Class.

82.    It would be inequitable and unjust for Defendants to retain the benefits of their misconduct, including the net interest income they earned at the expense of their own clients.

83.    Plaintiff and the other members of the Class suffered financial harm from Defendants' misconduct and are entitled to damages, including the restitution and disgorgement of the profits unjustly obtained by Defendants, plus prejudgment interest on those amounts.

## COUNT THREE
### Breach of Contract
### Brought on behalf of the Class Against All Defendants

84.    Plaintiff, individually and on behalf of the Class, hereby re-alleges the allegations set forth above as if fully set forth herein.

85.    The LPL agreements for its investment accounts offered and provided to members of the Class are a valid and binding contract between LPL and its accountholders.

86.    The governing documents require LPL to act in the customer's "best interest and not put [LPL's] interest ahead of yours."

87.    LPL breached the terms of its agreements with Plaintiff and the Class because LPL did not pay its customers a reasonable rate of interest on their cash deposits.  LPL further extracted for itself unreasonable interest rate payments and fees from LPL's affiliated banks.

88.    Plaintiff and the members of the Class suffered financial harm from the Defendants' misconduct, and they are entitled to damages from the Defendants, plus prejudgment interest thereon.

# COUNT FOUR

## Breach of the Implied Covenant of Good Faith and Fair Dealing
### Brought on behalf of the Class Against All Defendants

89.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

90.     LPL accountholders entered into a written contract with LPL—the terms of which are contained in and incorporated into various standardized documents drafted by LPL, including the ICA and DCA Disclosure Booklets.  These documents were and are, for all purposes relevant hereto, contracts between the accountholders and LPL.

91.     Plaintiff and members of the Class paid valuable consideration in exchange for these contractual rights.

92.     Inherent in these contracts was, and is, an implied covenant of good faith and fair dealing, requiring LPL to deal fairly with Plaintiff and other accountholders, to fulfill their obligations to Plaintiff and Class members in good faith, and to not deprive Plaintiff and Class members of the fruits of their bargain.

93.     By failing to pay Plaintiff and the Class members a reasonable rate of interest, LPL breached the implied covenant of good faith and fair dealing inherent in the contracts.  Through the implied covenant of good faith and fair dealing, LPL was obligated to pay Plaintiff and the members of the Class a reasonable rate of interest.  By failing to do so, LPL violated the reasonable expectations of the members of the Class.

94.     Plaintiff and the other members of the Class suffered damages as a direct and proximate result of the foregoing breach of the implied covenant of good faith and fair dealing, and they are entitled to damages from the Defendants, plus prejudgment interest thereon.

# COUNT FIVE

### For Gross Negligence
### Brought on Behalf of the Class Against All Defendants

95.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.    As set forth above, Defendants owed fiduciary duties to Plaintiff and the other members of the Class in the operation of the LPL Cash Sweep Program.

97.    Defendants breached their duties to Plaintiff and the Class by acting in their own best interest to the detriment to Plaintiff and the Class, which included failing to pay a reasonable rate of interest on customers' LPL cash sweep account balances.

98.    Defendants' misconduct was grossly negligent because it comprised a reckless disregard for LPL's clients' best interests, and represented an extreme departure from the ordinary standard of care.

99.    Defendants' misconduct directly and proximately caused financial harm to Plaintiff and the other members of the Class.  As a result, Plaintiff and other Class members are entitled to damages from the Defendants, plus prejudgment interest thereon.

## VII.  DEMAND FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, demands judgment and relief as follows:

100.    For an order certifying the proposed Class, and appointing Plaintiff and Plaintiff's counsel to represent the proposed Class;

101.    For an order awarding Plaintiff and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

102.    For an order awarding Plaintiff and Class members restitution, disgorgement, or such other and further relief as the Court deems proper; and

103.   For an order awarding Plaintiff and the Class reasonable attorneys' fees and costs of suit, including expert witness fees.

## VIII. JURY TRIAL DEMAND

Plaintiff, individually and on behalf of the Class, demands a trial by jury on all issues so triable.

Dated:  September 26, 2024

Respectfully submitted,

*/s/ Jonathan D. Uslaner*

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

Salvatore J. Graziano (*pro hac vice* forthcoming)
John Rizio-Hamilton (*pro hac vice* forthcoming)
Avi Josefson (*pro hac vice* forthcoming)
Adam Wierzbowski (*pro hac vice* forthcoming)
Michael D. Blatchley (*pro hac vice* forthcoming)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
salvatore@blbglaw.com
johnr@blbglaw.com
avi@blbglaw.com
adam@blbglaw.com
michaelb@blbglaw.com

-and-

**BUZIN LAW, P.C.**
Robert J. Jackson, Jr. (*pro hac vice* forthcoming)
3003 Purchase Street
P.O. Box 529
Purchase, New York 10577
Tel: (212) 879-8100
robert.j.jackson@nyu.edu

*Counsel for Plaintiff and the Proposed Class*